212 F.Supp.2d 1105 (2002)
Reginald CLEMONS, Petitioner,
v.
Allen LUEBBERS, Respondent.
No. 4:97CV2344 CDP.
United States District Court, E.D. Missouri, Eastern Division.
August 1, 2002.
*1106 *1107 Mark G. Arnold, Husch & Eppenberger, LLC, St. Louis, MO, John J. Kenney, David Elbaum, Sharon L. Colckhausen, Nina L. Rifkind, Simpson & Thacher, New York City, for Petitioner.
Susan D. Boresi, Attorney General of Missouri, Assistant Attorney General, St. Louis, MO, Stephen D. Hawke, Attorney General of Missouri, Assistant Attorney General, Jefferson City, MO, for Michael Bowersox.
Judith A. Ronzio, St. Louis Metropolitan Police Dept., St. Louis, MO, for Bd. of Police Commissioners of City of St. Louis.
Michael Chapey, MECC, Pacific, MO, for Michael James Chapey.

MEMORANDUM AND ORDER
PERRY, District Judge.
Reginald Clemons seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Clemons was convicted by a jury and sentenced to death for the murders of Julie and Robin Kerry. He raises numerous claims of constitutional violations. One of the claims has merit.
Clemons is entitled to a writ of habeas corpus vacating the death penalty in this case, because six persons were unconstitutionally excluded from serving on the jury that sentenced him to death. Although these six venirepersons expressed reservations about imposing the death penalty, they were  under the standards established by the United States Supreme Court  actually qualified to serve on the jury. Their exclusion violated Clemons' rights under the Sixth and Fourteenth Amendments to the United States Constitution. I will therefore issue a writ vacating the death penalty and directing that Clemons either be sentenced to life imprisonment without parole, or that he be given a new penalty-phase trial.

I. FACTUAL BACKGROUND

On April 4, 1991, sisters Julie and Robin Kerry decided to show their cousin, Thomas Cummins, a graffiti poem they had painted on the Chain of Rocks Bridge. This bridge across the Mississippi River had been closed to traffic for several years, and had become an illicit late-night gathering place for young people. The three victims went to the bridge at approximately 11:30 that night.
A little earlier the same evening, another set of young people also decided to visit the bridge: Reginald Clemons, Antonio Richardson, Marlin Gray and Daniel Winfrey. Both groups started on the Missouri side of the bridge, but the Clemons group, having begun earlier, was returning westbound when it encountered the Kerry group, who were walking east. The groups met, conversed, and then went on their ways: the Clemons group walking west, toward the Missouri side, and the Kerry group heading east, toward the Illinois side.
After the two groups had separated, according to the testimony of Daniel Winfrey, Clemons suggested that his group rob the Kerry group. Gray responded that he felt like hurting someone, and Richardson suggested raping the Kerrys. The Clemons group then caught up with the Kerry group. Both Robin and Julie Kerry were raped, while Thomas Cummins was restrained. After the rapes, all three victims were forced through a manhole in the *1108 bridge deck to a platform below the bridge. From there, both Robin and Julie Kerry were pushed off the bridge, and Thomas Cummins was forced to jump. Cummins lived, and testified at the trials. Neither Robin nor Julie survived.
Following lengthy police interrogation, Thomas Cummins confessed to the crime, but almost immediately recanted his confession. Although Cummins was initially charged with capital murder, those charges were dropped after Clemons, Winfrey, Gray and Richardson were arrested. Cummins filed a civil suit against the City relating to his arrest, and that case was settled before trial.

II. PROCEDURAL BACKGROUND

Winfrey eventually pleaded guilty to two counts of second degree murder and agreed to testify against the other three in exchange for a recommended thirty-year sentence. The other three were tried separately and each was convicted and sentenced to death.
Richardson went to trial first, and was convicted, but in the penalty phase the jury could not agree on the sentence. Under Missouri law the judge then became the sentencer, and sentenced Richardson to death. Richardson's conviction and sentence were affirmed by the Missouri Supreme Court. State v. Richardson, 923 S.W.2d 301 (Mo. en banc 1996). His federal habeas petition was denied, and that denial was affirmed. Richardson v. Bowersox, 188 F.3d 973 (8th Cir.1999).
Gray then went to trial, and was convicted. He was sentenced to death on October 21, 1992. His conviction and death sentence were affirmed. State v. Gray, 887 S.W.2d 369 (Mo. en banc 1994). His federal habeas petition was denied, and that denial was affirmed. Gray v. Bowersox, 281 F.3d 749 (8th Cir.2002).
Petitioner Reginald Clemons' trial began before Circuit Judge Edward M. Peek on January 25, 1993. The jury found Clemons guilty of two counts of first-degree murder, § 565.020, Mo. Rev. Stat, on February 13. The penalty phase began on February 15, and on February 18, 1993, the jury returned a verdict for the death penalty on both counts. Judge Peek later sentenced Clemons to death pursuant to the jury verdicts.
Clemons filed a motion for post-conviction relief pursuant to Missouri Rule 29.15, which he subsequently amended. Following a lengthy evidentiary hearing spanning several days in April and September of 1995, the trial court denied the 29.15 motion. On consolidated appeal, the Missouri Supreme Court affirmed the conviction and sentence and the denial of post-conviction relief. State v. Clemons, 946 S.W.2d 206 (Mo. en banc 1997).
Clemons now seeks federal habeas corpus relief in this Court pursuant to 28 U.S.C. § 2254, asserting that his conviction and sentence violate his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. I allowed discovery on some grounds, and held an evidentiary hearing on one ground. Counsel have extensively briefed all the issues.
In my orders of July 23, 1999 and August 15, 2000, which are incorporated herein by reference, I made certain rulings that dispose of some issues. In particular, I held in the July 23, 1999 order that Clemons' Brady claims were procedurally barred, but that his claims regarding prosecutorial intimidation of witness Michael Chapey were not. In the order of August 15, 2000, I ruled that the claims of prosecutorial intimidation of trial counsel during the state post-conviction relief process were not cognizable in a federal habeas proceeding, and that the state court determination that Clemons' confession was not coerced was supported by the record.

*1109 III. GROUNDS RAISED

Clemons seeks habeas relief on the following grounds:
1. Petitioner is actually innocent and his execution would violate the Eighth Amendment's prohibition on cruel and unusual punishment and the Fourteenth Amendment guarantee of due process.
2. Clemons' statements were obtained after he invoked his rights to counsel and to remain silent, so their introduction against him violated his Sixth Amendment right to counsel, his Fifth Amendment privilege against self-incrimination, and his Fourteenth Amendment due process rights.
3. Clemons' statements were the product of coercion, and were therefore obtained in violation of his Fifth Amendment privilege against self-incrimination and his Fourteenth Amendment due process rights.
4. Petitioner's rights to an impartial jury under the Sixth, Eighth and Fourteenth Amendments were violated because death-qualified panel members were improperly stricken for cause.
4A: Exclusion of venireman Doss was improper.
4B: Exclusion of venirepersons Sanders, Elrod, Stewart, Passalacqua, Jones and/or Wetteroth was improper.
4C: Venirepersons were stricken for cause based on their responses to improper hypothetical questions.
4D: A disproportionate number of persons were stricken as not able to return the death penalty, as a result of a combination of errors by the trial court and misconduct by the prosecutor.
5. Petitioner was denied an impartial jury due to extensive pretrial publicity, the court's refusal to conduct individual voir dire, and the presence in the venire of a person who assisted the prosecutor in investigations of the crimes.
6. The prosecutor engaged in extensive misconduct, resulting in a conviction obtained in violation of Clemons' due process and confrontation clause rights.
6A: Michael Chapey, a witness who would have provided exculpatory evidence, was threatened and intimidated by the prosecutor and therefore refused to testify.
6B: The state tampered with evidence.
6C: The state failed to comply with its obligations under Brady v. Maryland to disclose exculpatory evidence.
6D: The state improperly introduced out-of-court statements of co-defendant Antonio Richardson, in violation of Clemons' Sixth Amendment confrontation right.
6E: The state knowingly presented perjured testimony because witness Thomas Cummins testified that he was beaten by police, and the police officer witnesses testified to the contrary.
7. Petitioner was denied effective assistance of trial counsel in the investigation and preparation of his defense because:
(a) Counsel failed to conduct a proper investigation for the guilt phase, specifically
(i) counsel failed to prove that Cummins' identification of Clemons at a line up was impermissibly suggestive;
(ii) counsel failed to contact witnesses including Dr. Caldwell, Marie Hicks and Cedric Richardson, and failed to use the investigation from Internal Affairs which would have shown a pattern *1110 of police brutality in investigating the case;
(iii) counsel failed to investigate fact witnesses, including bystanders on the Illinois shore;
(iv) counsel failed to effectively impeach prosecution witnesses at trial.
(b) Counsel filed to retain expert witnesses, both for the guilt phase and for the penalty phase of trial, specifically experts on the subjects of:
(i) the distance from the bridge to the water and the likelihood that Cummins could have survived;
(ii) petitioner's background, psychology, and relationship with Marlin Gray and his propensity to follow, but not instigate, violence;
(iii) petitioner's non-violent nature and the mitigating circumstances of his background and educational difficulties.
(c) Counsel failed to prepare and file appropriate and adequate pretrial motions, in particular:
(i) motions to suppress the statements;
(ii) motion to suppress the line-up identification;
(iii) the Dr. Cross motion;
(iv) voir dire motions.
(d) Counsel failed to compel discovery from the prosecution, in particular an initial audiotaped interview and a used condom found on the bridge.
(e) Counsel failed to take depositions of Gene Cummins (Thomas Cummins' father) and Detective Pappas.
(f) Counsel failed to timely file a motion for expert witness funds under Ake v. Oklahoma.

8. The prosecutor made numerous improper statements during guiltphase closing arguments.
9. Petitioner was denied effective assistance of trial counsel during the trial because counsel failed to
(a) challenge Michael Chapey's invocation of his fifth amendment right against self-incrimination;
(b) make a record of the prosecutor's intimidation of Chapey;
(c) develop and present evidence to support the motion to suppress Clemons' statements;
(d) properly impeach prosecution witnesses Cummins and the police officers regarding the inconsistency in their testimony;
(e) properly cross examine Cummins about the unreliability of his lineup identification of Clemons;
(f) properly cross-examine the police officers about the unreliability of Cummins' line-up identification or about the dropping of the charges against Cummins;
(g) place in evidence an important Cummins statement that Gray was the individual standing above him at the time the victims were pushed into the water;
(h) impeach Daniel Winfrey with an inconsistent statement; and
(i) opening the door to the statements of Antonio Richardson.
10. The deliberation instruction was ambiguous and improperly permitted conviction for first-degree murder upon a finding that petitioner's co-defendants deliberated.
11. The prosecution made improper comments during the penalty-phase closing argument;

*1111 12. Petitioner was denied effective assistance of counsel during the penalty phase because counsel failed to
(a) present psychological, psychiatric, and educational experts attesting to petitioner's nonviolent character;
(b) present character witnesses; and
(c) failed to rebut evidence of petitioner's violent conduct in prison.
13. Based on improper instructions, the jury improperly "double counted" an aggravating factor in its penalty deliberations.
14. The post-conviction relief court improperly excluded evidence of witness intimidation based upon the conclusion that claims of prosecutorial misconduct were not a proper subject for post-conviction relief.
15. Counsel failed to properly preserve or exhaust proper constitutional claims.

IV. DISCUSSION

A. Procedural Bar

Habeas petitioners must fairly present the substance of their federal claims to the state courts. 28 U.S.C. § 2254(b)(1)(A). To fairly present a habeas claim, a petitioner must present the same facts and legal theories to the state courts and to the federal court. Jones v. Jerrison, 20 F.3d 849, 854 (8th Cir.1994). Failure to fairly present a claim to the state courts procedurally bars federal court review unless the petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).
Respondent asserts that several of petitioner's claims are procedurally barred. Clemons argues that to the extent his claims were not properly presented to the state courts, the procedural default was caused by ineffective assistance of counsel or should be excused because he falls within the miscarriage of justice exception.
To come within the miscarriage of justice exception, petitioner must demonstrate that he is "actually innocent" of the crime for which he was convicted. Schlup v. Delo, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995); Weeks v. Bowersox, 119 F.3d 1342, 1350 (8th Cir.1997)(en banc). To make of a showing of actual innocence, petitioner must (1) support his allegations of constitutional error with new reliable evidence not introduced at trial; and (2) establish that it is more likely than not that no reasonable jury would have convicted him after hearing the new evidence. Schlup, 513 U.S. at 327-28, 115 S.Ct. 851; Weeks, 119 F.3d at 1351. The actual innocence exception is a very narrow and limited exception, reserved for extraordinary cases that compel the exercise of the court's equitable discretion. Schlup, 513 U.S. at 324, 115 S.Ct. 851; Weeks, 119 F.3d at 1351. Few cases meet this very stringent standard.
To support his claim of actual innocence, Clemons has provided the affidavit of Christopher Dunn, an inmate who attests that Marlin Gray told him that Clemons was not on the bridge at the time the victims were pushed off and that Clemons "did not touch them." Clemons states that this is newly discovered evidence, because Dunn only provided this information recently. He argues that had the jury heard this evidence, no reasonable jury would have convicted him.
There are two problems with this argument of actual innocence: first, the evidence is simply not credible, and the jury is very unlikely to have believed it even if it had been presented at trial; and, second, *1112 it would be inadmissible hearsay, so the jury could not have heard it, even if Dunn had come forward earlier. Gray did not testify at Clemons' trial, and although he did testify at his own trial, his testimony there was very different from the story Dunn now provides. Dunn could not have testified at Clemons' trial about what Gray allegedly told him, because it would have been inadmissible hearsay.
Clemons' case now has at least three jail-house versions of what different participants in the crime supposedly told a jail acquaintance. We have Dunn's recent story of what Gray said, which is inconsistent with Gray's own testimony at his own trial. We have Michael Chapey's testimony about what Winfrey said, which, as is discussed more fully below, I do not find credible at all. And at Clemons' trial the jury heard the very limited testimony of Luis Vega, who testified that Winfrey told him that in America you could do anything and get away with it, that he was going to lie to get a deal, and that nobody would believe his co-defendants because they were a "bunch of niggers."
This evidence falls far short of what is needed to establish actual innocence as an exception to a procedural bar. The Dunn testimony is not reliable, and it certainly would not affect a reasonable juror's determination in this case, even if it somehow could have been introduced. Clemons has not shown that he is actually innocent in order to overcome the procedural bar.

1. Jury Selection Issues

In Claims 4C, 4D and 5 Clemons argues that he was denied an impartial jury because a disproportionate number of jurors were excluded as not death qualified and his counsel failed to rehabilitate them, because of extensive pretrial publicity, because of the trial court's conduct of voir dire in groups rather than individually, and because of the presence in the venire of a person who assisted the prosecutor in investigations of the crimes. None of these claims was raised on the consolidated appeal and the Missouri Supreme Court did not consider them. They are procedurally barred, and will be denied for that reason.

2. Prosecutorial Misconduct

As set forth above, I previously ruled that petitioner's claims of prosecutorial misconduct regarding prosecutor Moss's alleged withholding of exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), were procedurally barred. (Claim 6C). Clemons seeks reconsideration of that determination on the basis of actual innocence, based on the Dunn affidavit. I have rejected this claim, and continue to find that Claim 6C is procedurally barred.
Numerous of Clemons' other claims of prosecutorial misconduct were also not raised before the state courts, and so should be procedurally barred. These include claim 6B, relating to evidence tampering; 6D, relating to the out-of-court statements of co-defendant Antonio Richardson; 6E, presentation of perjured testimony; and 8, improper guilt-phase closing arguments.
Clemons has argued that claim 6D and claim 8, in particular, should not be barred because his failure to raise the claims properly was the result of ineffective assistance of counsel. The Missouri Supreme Court considered both of these claims as claims of ineffective assistance of counsel, and determined that counsel was not ineffective in either respect. With regard to Richardson's statement the Court found there was simply no prejudice because "there is no reason to conclude that references to Richardson's statements formed the essential foundation on which the jury built its verdict." 946 S.W.2d at 227. The Court found no ineffectiveness in counsel's *1113 failure to object to the closing argument because the closing argument was not improper. 946 S.W.2d at 227-229. I have carefully reviewed the state court decisions as well as the underlying evidence, and agree that counsel was not ineffective for failing to raise these issues. Since counsel was not ineffective, the procedural bar is not overcome, and I may not consider the merits of these arguments.

3. Ineffective Assistance Allegations

Certain of Clemons' numerous allegations of ineffective assistance of counsel were not raised properly in the state courts, and therefore are procedurally barred. Those claims are the ones listed above as claims 7(a)(i), (iii) and (iv) (relating to failure to conduct an adequate investigation for the guilt phase of the trial); 7(b)(i) (relating to failure to hire a bridge or distance expert); 7(c)(ii), (iii) and (iv)(alleging ineffectiveness because counsel did not prevail on suppression and other pretrial motions); 7(d) and (e) (discovery and deposition issues); and 9(a), (d), (e), (f), (g), (h) and (i) (relating to trial errors). These claims were procedurally defaulted in the state courts, there has been no showing of cause and prejudice to overcome the procedural defaults, and therefore they are barred from federal habeas review.
Clemons has argued generally that his procedural defaults should be excused because his trial counsel, Robert Constantinou, was threatened and intimidated by prosecutor Nels Moss before the post-conviction motion hearing. In my order of August 15, 2000, I denied an evidentiary hearing on any issues relating to the supposed intimidation of Constantinou. Constantinou stated in his affidavit that he had felt threatened by Moss' demeanor and references to malpractice, but that "I cannot identify any specific testimony I gave at the 29.15 hearing that would have been different absent Mr. Moss' attempts to intimidate me." These general allegations of intimidation do not provide any basis for me to conclude that there is cause to overcome the procedural defaults.

B. Legal Standard for Issues Decided by State Court

When reviewing a claim that has been determined on its merits in state court, a federal court cannot grant habeas relief on the claim unless the state court's adjudication of the claim 
(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
28 U.S.C. § 2254(d). In reviewing a state court conviction, a federal court must presume that a state court's factual determinations are correct; this presumption may be rebutted only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Under the "contrary to" clause of § 2254(d)(1), "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). "In applying the `unreasonable application' clause of § 2254(d)(1), `a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" Evans v. Rogerson, 223 F.3d 869, 872 (8th Cir. 2000) (quoting Williams, 529 U.S. at 413, 120 S.Ct. 1495). "[A] federal habeas court *1114 may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Williams, 529 U.S. at 411, 120 S.Ct. 1495. The application must also be objectively unreasonable.

Ground 1: "Actual Innocence"
Clemons captions his first claim for relief as one of actual innocence, but a careful review of his argument shows that it is really a claim that his due process rights were violated because there was insufficient evidence from which a reasonable jury could convict him. He claims that he was actually innocent of first degree murder, because there is no evidence from which a reasonable jury could find that he deliberated or planned to murder the Kerry sisters.
In a habeas challenge to the sufficiency of the evidence, the relevant question is whether, after reviewing the evidence in the light most favorable to the prosecution, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Armstrong v. Gammon, 195 F.3d 441, 444 (8th Cir.1999) (quoting Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). Federal habeas courts must presume that the trier of fact resolved all conflicting inferences in the record in favor of the state. Jackson, 443 U.S. at 326, 99 S.Ct. 2781. Moreover, a state appellate decision on sufficiency of the evidence is afforded deference. Id. at 323, 99 S.Ct. 2781.
In reviewing whether the evidence was sufficient for Clemons to be convicted, the Missouri Supreme Court stated:
In cases of first-degree murder involving accomplice liability, the jury must find that the homicide may be imputed to an accomplice, the element of deliberation may not be imputed by association. Proof that a defendant merely aided another with the purpose of facilitating an intentional killing is not enough to prove first degree murder. To make its case, the state must introduce evidence from which a reasonable juror could conclude beyond a reasonable doubt that the defendant (1) committed acts that aided his codefendant in killing the victims; (2) defendant's conscious purpose in committing the acts was that the victims be killed; and (3) defendant committed the acts after coolly deliberating on the victims' deaths for some amount of time, no matter how short.
In State v. Gray, 887 S.W.2d 369 (Mo. banc 1994), a companion case, this Court addressed the question of accessory liability. In examining the evidence, the Court noted three circumstances that appear "highly relevant in determining if accomplice deliberation may be inferred." Id. at 376. The first circumstance is whether there is a statement or conduct by the defendant or by a codefendant in the presence of defendant prior to the murder indicating a purpose to kill someone. Id. Another is evidence that the murder was committed by means of a deadly weapon and the accomplice was aware that the deadly weapon was to be used in the commission of the crime. Id. at 377. Finally, evidence of deliberation will be found where it appears that the defendant either participated in the homicide or continued in the criminal enterprise even after it became apparent that a victim was to be killed. Id.

In this case, there is ample evidence of statements or conduct by the defendant or in the defendant's presence indicating a purpose to kill. When the plan was first conceived, Marlin Gray announced that he "felt like hurting someone." While the rapes were occurring, someone  by inference *1115 either appellant or Antonio Richardsonsaid to Julie Kerry: "You stupid bitch, do you want to die? I'll throw you off the bridge if you don't stop fighting." Appellant threw the sisters' clothes off of the bridge. After the rapes, first Richardson and then the appellant each put one of the Kerry sisters through the manhole to the platform below the bridge deck, from which the sisters were pushed to their deaths. Appellant then returned to the bridge deck where, after robbing Cummins, he discussed with Winfrey whether Cummins should live or die. Gray or Richardson could not have taken part in this discussion because Richardson was under the bridge and Gray had already started to walk off the bridge. Someone told Cummins that he had never had the pleasure of "popping" someone before. If appellant did not say this, it was said in his presence. Appellant then took Cummins and moved him next to the manhole, ordering him to lie down. Someone  either appellant or Winfreysaid, "You're going to die," after which appellant put Cummins into the manhole, before sending Winfrey to look for Gray and following Cummins through the manhole to the platform beneath the bridge himself. Once underneath the bridge, either appellant or Richardson pushed the Kerry sisters from the bridge and ordered Cummins to jump into the river. Afterward, appellant bragged, "We threw them off."
Statements made by the defendant or in his presence indicated an intention to kill. Appellant continued to play an active role in the death-producing events, even after it became abundantly clear that the victims would be killed. The evidence of deliberation in this case is substantial, compelling, and without doubt. The trial court did not err in submitting the charges of first degree murder to the jury.
946 S.W.2d at 216-217 (citations and footnotes omitted).
The Missouri Supreme Court's factual recitation is fully supported by the evidence presented at trial. A rational juror could easily find all the elements of the crime  including the necessary deliberationfrom the evidence, and I cannot say that the Missouri court's determination that this evidence was sufficient is an unreasonable determination of the facts or an unreasonable application of clearly established federal law. Clemons' first ground for habeas review is therefore denied.

Claims 2 and 3: Clemons' Statements
In grounds 2 and 3 Clemons challenges the admission of his tape recorded confession as well as rebuttal evidence presented about a statement he made to a family friend who was a police officer. He asserts that the statements were obtained in violation of his Sixth Amendment right to counsel and his rights under Miranda v. Arizona because he was questioned after he invoked his right to counsel. He also asserts that the statements were coerced, in violation of his Fifth and Fourteenth Amendment rights. As stated above, I ruled in my August 15, 2000 order denying a hearing that the state court determination that the confession had not been coerced was not unreasonable. I now also find that the state court's determination that the statement was not obtained in violation of the Sixth Amendment right to counsel and the Fifth Amendment right to remain silent is not an unreasonable determination of the facts or an unreasonable application of clearly established federal law. I also find that the admission of the testimony of the friend, Officer Williams, did not violate Clemons' constitutional rights.
*1116 Clemons claims that Detectives Pappas and Brauer beat him to obtain his April 7, 1991, confession, and that they ignored his invocation of his Miranda rights and his request for counsel. He relies, in part, on the manner in which the police obtained the initial and now refuted confession of Thomas Cummins. Essentially Clemons argues that the coercion of a confession from Cummins shows a pattern of police coercion, and shows that he (Clemons) was treated the same way as Cummins and his confession was similarly coerced. Clemons also relies on his own statement made to the police Internal Affairs Department on April 9, retracting the confession and claiming coercion. Finally, he claims that the statement he made to family friend Officer Williams, who visited him in jail on April 8 at Clemons' mother's request, was obtained in violation of his constitutional rights.
The Missouri Supreme Court considered and rejected all of these claims, and I will set out their opinion at some length, because it explains the facts more fully:
The facts show that about 6:00 p.m. on April 7, 1991, Officers Walsh and Brauer went to appellant's home and, finding him there, asked him if he would accompany them to police headquarters, as his name had surfaced in "the bridge case." Appellant agreed to accompany them. The officers did not handcuff nor arrest him, and appellant was free to leave. Appellant arrived at police headquarters with the officers at about 6:30 p.m. The police advised him of the rights protected by the Miranda warnings. Appellant indicated that he understood those rights, did not want a lawyer, and was willing to talk to the police. A 45-minute interview ensued, followed by a 20-minute break, and then another interview which lasted between an hour and an hour and a half. At the conclusion of the second interview, the officers arrested appellant. Appellant agreed to make an audiotaped confession. Prior to the taped confession, police again advised appellant of his constitutional rights. Appellant waived those rights in writing again.
. . . . .
At the suppression hearing, appellant testified that the police officers conducting the interrogation beat him about the head and chest and slammed his head against the wall. The detectives involved categorically denied that any physical contact occurred. Appellant's initial attorney in this matter testified that he visited appellant in a holding cell at police headquarters the afternoon of April 8th, some 14 hours after appellant's interview had concluded, and observed that the right side of appellant's face was swollen. However, Warren Williams, a friend of appellant's family who is employed as a police officer, visited appellant at the request of appellant's mother and saw appellant literally minutes before appellant's attorney arrived. Williams testified that he did not observe any sign of injury. The next day, April 9, at appellant's arraignment, the presiding judge ordered that appellant be examined at the emergency room at the Regional Hospital. According to the hospital records, appellant was diagnosed with myalgia, mild myositis, and a swollen right cheek.
Viewing this evidence in the light most favorable to the trial court's ruling, we find sufficient evidence to support the trial court's finding that appellant's confession was voluntary. The trial court had the opportunity to judge the credibility of the witnesses and obviously found the state's witnesses' testimony more credible than appellant's. While there was additional testimony from appellant's family that appellant's face was swollen, all of these observations were *1117 made some 48 hours or more after appellant's interview and confession. The evidence, including the hospital records, simply does not demonstrate either when or how appellant incurred any injury. Nor does it establish that an injury actually occurred at the hands of the police officers conducting his interview. Appellant failed to meet his burden. We find no abuse of discretion in failing to suppress appellant's confession on these grounds.
Appellant also claims that the trial court should have suppressed his statements because police officers ignored his invocation of his right to remain silent and his right to counsel. This alleged assertion took place at the beginning of appellant's audiotaped confession. Appellant claims that the taped statement demonstrates that the police violated the rule announced in Miranda.

The audiotaped statement begins with the police reading each Miranda warning and asking appellant whether he understands that right. Appellant states that he does. Detective Pappas then asks:
Q. Okay. At this time, Reginald ... do you wish to waive these constitutional rights and make a statement concerning what happened on the night of April 5th, 1991, on ... the Chain of Rocks Bridge?
A. No, sir.
Appellant cites language in Miranda that states that questioning must cease if the suspect "indicates in any manner and at any state of the process that he wishes to consult with an attorney before speaking." Appellant maintains that when he said, "No, sir," in response to the officer's question, he asserted his intention not to waive his constitutional rights and that the interview should have stopped at once. Instead, the police continued questioning as follows:
Q. Okay, you do  you don't want to make a statement at this time?
A. I don't want to use the rights.
Q. In other words ... you're waiving your rights to make a statement.... Is that right?
A. Yes.
Q. Okay. So you're waiving your constitutional rights?
A. Okay, sir.
DET. BRAUER: ... What it means is that you give up those rights and that you want to talk about the incident. Is that what you want to do? Tell us about the incident?
A. Yes, sir.
DET. BRAUER: Okay. That's what we mean. That's what it means to waive your rights.
DET. PAPPAS: All that means is that you want to waive these rights at this time to make ... an audio taped statement. That's what we're talking about. Okay. Do you still understand what we're saying? I don't want you to be confused about this.
A. Yes. I want to tell everything that happened up on the bridge.
Q. Okay. So you're wishing to make a statement?
A. Yes.
Despite appellant's hopeful, contrary claim, the transcript clearly shows that appellant affirmatively waived his rights and agreed to make an audio-taped statement. Undaunted, appellant contends that the dialogue clarifying his intent should not be considered at all, in that his initial response  "No, sir"  was an unequivocal statement of his intent to exercise his rights. Thus, the police should immediately have ceased any questioning of any type.
We disagree. Unlike appellant, we do not read Miranda searching for out-ofcontext *1118 sentences that support a preferred outcome. Honestly read, Miranda contemplates situations in which there may be some question as to whether a defendant wishes to assert his rights or not. In such instances, the interviewer may clarify the defendant's intent by continued questioning as to whether or not the defendant does or does not waive his rights.
In light of the fact that appellant had been freely speaking with the police for the past two hours, had already confessed, and had agreed to make a tape-recorded statement before the detectives began to record the confession, we find that appellant's response was not an unequivocal assertion of his rights but rather an ambiguous, equivocal statement of his intent that required clarification. The detectives did not violate appellant's constitutional rights by asking questions to clarify his intentions. His intentions, as reflected by the entire conversation, were to waive his rights and make a statement.
The trial court did not abuse its discretion in failing to suppress the taped confession.
Finally, appellant contends that the trial court erred in refusing to suppress statements he made to Warren Williams because appellant made those statements during a custodial interrogation and appellant had not waived his Fifth and Sixth Amendment rights.
Appellant's mother, Vera Thomas, grew concerned when she heard nothing from appellant after he left with the homicide detectives early in the evening of April 7th. Thomas called a friend of the family, Warren Williams, a police officer who was once married to Thomas's cousin, and asked him to try to discover what had happened to appellant. Williams made a few phone calls and found that appellant was in the men's holdover at police headquarters. Williams, who had known appellant since appellant's birth, visited appellant at the holdover on the afternoon of April 8th. During the course of this visit, appellant told Williams that he had gotten mixed up with the wrong people, and that they had gotten drunk and raped two girls. Appellant said that one of the other boys pushed the girls into the river, out of concern that the girls might later identify him.
Appellant now contends that the trial court should have suppressed this statement as the fruit of a custodial interrogation before which he had not waived his Fifth and Sixth Amendment rights. Appellant observes that he was in custody, that Williams was a police officer (although dressed in plain clothes at the time), and that appellant knew that Williams was a police officer. The state, on the other hand, counters that Williams acted as a concerned friend of the family, not in his official capacity as a police officer, when he met with appellant that afternoon. Furthermore, appellant had previously received the Miranda warnings and had waived his rights at that time. Even if Williams were acting as a police officer, the state contends, it was unnecessary for him to read appellant the Miranda warnings again.

Miranda warnings are not so ephemeral that they evaporate between questions. Once received, and the constitutional rights they protect waived, the waiver remains in effect until undone by the person in custody. The point is denied.
946 S.W.2d at 218-220 (footnotes and citations omitted).
The Missouri Supreme Court's determination that the April 7 confession was voluntary and not obtained through police coercion is not an unreasonable factual determination nor is it an unreasonable *1119 application of clearly established federal law. Although the Missouri Supreme Court may have misstated the law when it referred to Clemons failing to "meet his burden," a review of the record and the decision as a whole reveals that the Missouri courts applied the correct legal standard, and found that the state had met its burden of showing voluntariness. Conflicting evidence regarding Clemons' alleged injuries was presented, and the state court resolved these issues in favor of the state.
Additionally, I agree that the record does not show that Clemons had invoked his right to counsel before these statements were taken. He was given the Miranda warnings, stated that he understood them, and clearly indicated his intent to make a statement without first speaking to a lawyer.
Finally, the evidence presented at trial showed that Officer Williams visited Clemons at the jail at the request of Clemons' mother, and not for the purpose of interrogating him. The state presented Williams' testimony in rebuttal, partially in response to Clemons' argument about voluntariness of the confession. Cf., Owens v. Bowersox, 290 F.3d 960 (8th Cir.2002) (right to counsel waived where defendant indicated to his mother that he wanted to talk to police).
The Missouri Supreme Court's conclusion that none of these statements were made in violation of Clemons' rights under the 5th, 14th, or 6th amendment are not unreasonable determinations of the facts or unreasonable applications of established federal law. Clemons' did not invoke his right to counsel at any point during the questioning, and he was properly advised that he could do so. His later attempt to claim otherwise before the Internal Affairs Department, and his reliance on what happened with the Cummins confession do not change the facts about what happened to Clemons before he made the statements. When the circumstances as a whole are considered, it is clear that Clemons voluntarily, knowingly and intelligently waived his right to counsel.

Ground 4: Death Qualified Jury
In ground 4 petitioner alleges that he was denied an impartial jury because of various errors in the jury selection process. He has divided these claims into four subclaims: (A) the trial court mistakenly thought that venireman Doss had indicated he could not return the death penalty when, in fact, Doss had stated he could; (B) Doss and six other venirepersons (Sanders, Elrod, Stewart, Passalacqua, Jones and Wetteroth) were improperly found not to be death qualified because of improper hypotheticals asked by the prosecutor; (C) counsel was ineffective for not correcting the misimpression left by the prosecutor during voir dire about the deliberation needed; and (D) various prosecutorial and trial court errors resulted in a disproportionate number of venirepersons (47 out of an otherwise qualified panel of 97) being excluded as not death qualified.
Respondent argues that these claims are procedurally barred. The Missouri Supreme Court found that these claims of trial court error had not been properly preserved, but reviewed some of them as claims of ineffective assistance of counsel. I have carefully reviewed the record, and agree with Clemons that the first two of these claims were properly preserved at trial, in the motion for judgment of acquittal, and on the consolidated appeal. The Missouri Supreme Court's finding otherwise is in error. I therefore can consider them on the merits. See Hatley v. Lockhart, 990 F.2d 1070, 1072 (8th Cir.1993)(district court found claim was procedurally barred, but Court of Appeals *1120 found it was properly preserved and so considered it on merits). I agree that the subclaims C and D are procedurally barred, and I will not discuss those claims further.
The challenges set out in subclaims A and B are not as simple as they seem, because their basis is that the prosecutor gave the jurors an incorrect statement of the evidence needed to support accomplice liability, so it left the jurors with the mistaken belief that they would be asked to consider the death penalty on a lesser state of culpability than was actually required by the law. Clemons argues that the prosecutor's explanations of accomplice liability left out the element of cool deliberation, so that the potential jurors thought they were going to be asked to impose the death penalty even if Clemons had not deliberated on or intended the murders. The prosecutor's questions to the panel asked them if they could consider the death penalty even if Clemons was not the one to have pushed the women from the bridge, so long as he "did everything he could to help facilitate the murders." He complicated matters by using an armed robbery hypothetical where the element of "cool deliberation" is not necessary for a finding of accomplice liability. Clemons argues that this form of questioning improperly excluded too many people as not "death qualified," because if they had been told that the evidence would have to show "cool deliberation," then they would have been more likely to say they could consider the death penalty.
A trial court's decision regarding juror bias is a question of fact, entitled to deference so long as the findings are supported by the record. Antwine v. Delo, 54 F.3d 1357, 1369 (8th Cir.1995). In Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the Supreme Court held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." 391 U.S. at 522, 88 S.Ct. 1770. The Court later clarified Witherspoon by holding that in death penalty cases, a jury venireperson is properly stricken only when his views on the death penalty would "prevent or substantially impair the performance of his duties as a juror." Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). "If even one member of the venire is improperly excused for cause under Witherspoon, `the subsequently imposed death penalty [cannot] stand.'" Kinder v. Bowersox, 272 F.3d 532, 543 (8th Cir.2001), (quoting Gray v. Mississippi, 481 U.S. 648, 660, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987)). The cases recognize that bias in this situation will not always be evident with "unmistakable clarity" because it may not be possible to ask enough questions for the venirepersons to make their feelings unmistakably clear. Here the record is far from clear, although it is clear that the trial judge believed the jurors had indicated they could not consider the death penalty in an accomplice situation.
With regard to Mr. Doss (Claim 4A), the Missouri Supreme Court stated:
Appellant also claims that the trial court erred in striking venireman Doss for cause because Doss intimated that he could vote for the death penalty in an accomplice case. Doss initially indicated that he could not vote for the death penalty at all. Under further voir dire questioning by the prosecutor, Doss said he might be able to vote for death under certain circumstances. Doss then equivocated, saying that he still would not be able to vote for the death penalty if appellant were only guilty as an accomplice *1121 and did not actually push the girls off of the bridge. After further questioning by the prosecutor, Doss said the prosecutor might be able to show him something that would allow him to consider the death penalty even if appellant did not do the actual pushing. The trial court ultimately sustained the State's motion to strike Doss.
While a trial court cannot exclude a juror from a capital punishment case simply because of a conscientious objection to the death penalty, a juror may be excluded if his views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). The trial court has broad discretion in determining whether a prospective juror is "death qualified," as the trial judge is in a superior position to evaluate the demeanor and testimony of the prospective jurors. State v. McMillin, 783 S.W.2d 82, 93 (Mo.1990).
Doss's equivocal and shifting responses to questions focusing on his ability to impose the death penalty provide a sufficient rationale for the trial court's decision to sustain the state's motion. In light of Doss's conflicting testimony, the trial court did [not] abuse its discretion in striking Doss for cause. The motion court did not err in holding counsel not ineffective on this issue.
946 S.W.2d at 224 to 225. Here, as in Kinder, the record reveals that the trial judge "was left with the definite impression" that Doss "would be unable to faithfully and impartially apply the law." See 272 F.3d at 543. With regard to Doss, the Missouri Supreme Court correctly identified the controlling federal law and I cannot say that it unreasonably applied the law or made an unreasonable determination of the facts. Doss's first answer was unequivocally that he could not apply the death penalty for religious reasons. His later equivocation is not sufficient to overcome the initial unequivocal statement, even though the trial judge may have misremembered the exact details of it. Clemons is therefore not entitled to habeas relief on Claim 4A.
The situation with regard to the other six venire persons (Claim 4B) is more problematic, however, because they were  initially and throughout the voir dire  more equivocal in their responses than was Doss. To understand the claims, we must look at the hypothetical questions that were asked. Although I disagree with the Missouri Supreme Court's finding of procedural bar, the Court accurately stated the argument regarding the hypotheticals:
During the death qualification portion of voir dire, the prosecutor explained the concept of accomplice liability, at times using hypotheticals for this purpose. He asked prospective jurors whether they would be able to sentence an accomplice to death where the evidence did not show that the accomplice committed the act that directly caused the victims' deaths. Appellant charges that the prosecutor's hypotheticals misled the members of the venire because the hypotheticals dealt with an accomplice to robbery, rather than first degree murder, and because the prosecutor's explanations did not make clear that the accomplice also had to have the requisite intent to commit the crime.
946 S.W.2d at 224. The Missouri Supreme Court found that counsel was not ineffective for failing to preserve the alleged error for review because, in the view of the Missouri Supreme Court, the error, if any, in this hypothetical went to the issue of guilt, and not to death-qualification:
It is not necessary, however, for the prosecutor to make reference to the elements *1122 of first degree murder during death qualification of the jury. This is because the element of deliberation for the purpose of accomplice liability for first degree murder is relevant to a finding of guilt or innocence, not punishment. Death qualification focuses on an entirely different issue. Death qualification attempts to determine whether a potential juror could consider the full range of punishment if the defendant is found guilty of first degree murder. Thus, when the prosecutor asks a potential juror whether he or she could recommend the death penalty for an accomplice, the assumption  solely for the sake of asking and answering the punishment question  is that the jury has already found the defendant guilty of all of the elements of first degree murder, including deliberation, beyond a reasonable doubt. For this reason, deliberation is not an issue when a venireperson considers whether or not he or she could impose the death penalty.
946 S.W.2d at 225.
The problem with this analysis, of course, is that the jurors were given the hypothetical in the context of death-qualification questions. Although the Missouri Supreme Court found the hypotheticals not to be misleading because they went to issues of guilt, not penalty, the questions were asked in the context of penalty. The jurors were not reminded that they would have already found the defendant guilty by this point, they were simply asked whether they could impose the death penalty in a hypothetical scenario where  as Clemons' lawyers correctly point out  they would never be asked, under Missouri law, to impose the death penalty.
Here the six venirepersons each indicated some hesitancy about whether they could impose the death penalty in an accomplice situation where the defendant did not actually push the victims from the bridge. They were never asked if their views would change if it were shown that the defendant had the requisite mental state or if they had found that he had "cooly deliberated." In fact, none of those excluded indicated that they could not impose the death penalty under the proper circumstances: where the defendant had been shown to have had the requisite intent or deliberation. While it is true that the prosecutor is not required to list every element of the offense in conducting the voir dire, if the trial court is going to determine that jurors should be removed for bias against the death penalty, the jurors must be asked the correct questions.
To the extent that the Missouri Supreme Court held otherwise, its determination was contrary to and was an unreasonable application of Witherspoon and Wainwright. The jury that sentenced Clemons to death was chosen by improperly excluding venirepersons because they expressed concerns about imposing the death penalty in a scenario where the law of Missouri does not allow the death penalty. This improperly excluded persons who expressed legally appropriate reservations, rather than excluding persons whose views would prevent them from performing their duties as jurors to apply the law. Under Gray v. Mississippi, vacation of the death penalty is required when even one juror is improperly excluded. Here there were six. I will therefore grant habeas relief on this claim and vacate the death penalty. The state must either resentence Clemons to life without parole or conduct a new penalty-phase trial.

Grounds 6, 8 and 11: Prosecutorial Misconduct
In grounds 6, 8, and 11 Clemons alleges that the prosecutor engaged in extensive misconduct. The claims include:

*1123 6. The prosecutor engaged in extensive misconduct, resulting in a conviction obtained in violation of Clemons' due process and confrontation clause rights.
6A: Michael Chapey, a witness who would have provided exculpatory evidence, was threatened and intimidated by the prosecutor and therefore refused to testify.
6B: The state tampered with evidence.
6C: The state failed to comply with its obligations under Brady v. Maryland to disclose exculpatory evidence.
6D: The state improperly introduced out-of-court statements of co-defendant Antonio Richardson, in violation of Clemons' Sixth Amendment confrontation right.
6E: The state knowingly presented perjured testimony because witness Thomas Cummins testified that he was beaten by police, and the police officer witnesses testified to the contrary.
8. The prosecutor made numerous improper statements during guiltphase closing arguments.
11. The prosecution made improper comments during penalty-phase closing argument.
As set forth above, all of the claims set out in ground 8 and 6 are procedurally barred except for the claim contained in 6A regarding Michael Chapey, which I will reach on the merits. I will also reach the merits of the claims raised in Ground 11, as they were reached on the merits by the Missouri Supreme Court.
I must preface this discussion by stating that there is considerable evidence of prosecutorial over-aggressiveness in this case. The transcript is replete with admonitions from the trial judge to the prosecutor for improper questions, objections, and comments. Ultimately the trial judge held the prosecutor in contempt of court for violating a court order. The trial transcript and the record as a whole show that the prosecutor was abusive and boorish, and that his tactics overall were calculated to intimidate the defense at every turn. While this conduct is certainly unprofessional, I cannot say, upon review, that any of it rises to the level of misconduct requiring a grant of habeas. Most of the improper conduct, in fact, relates to claims that I am not even considering on the merits, because they were procedurally barred.
"[P]rosecutorial misconduct does not merit federal habeas relief unless the misconduct infected the trial with enough unfairness to render [petitioner's] conviction a denial of due process." Louisell v. Dir. of Iowa Dept. of Corr., 178 F.3d 1019, 1023 (8th Cir.1999) (quoting Roberts v. Bowersox, 137 F.3d 1062, 1066 (8th Cir. 1998)); see also Stringer v. Hedgepeth, 280 F.3d 826 (8th Cir.2002) (finding that prosecutor engaged in misconduct but denying habeas because evidence of guilt was so strong that the guilty verdict could not be attributed to the prosecutor's improper remarks). A petitioner seeking habeas relief must show both that the prosecutor engaged in misconduct and that there is a "reasonable probability that the error complained of affected the outcome of the trial  i.e., that absent the alleged impropriety the verdict probably would have been different." Stringer, 280 F.3d at 829 (quoting Anderson v. Goeke, 44 F.3d 675, 679 (8th Cir.1995) (citations omitted)). To show a due process violation arising from improper closing arguments, the prosecutor's comments must be "so egregious that they fatally infected the proceedings and rendered the entire trial fundamentally unfair." Moore v. Wyrick, 760 F.2d 884, 886 (8th Cir.1985).

*1124 1. Claim 6A: Michael Chapey testimony

Clemons asserts that his due process rights were violated when prosecuting attorney Nels Moss threatened and intimidated witness Michael Chapey, who Clemons had planned to call to impeach the testimony of Daniel Winfrey. I held an evidentiary hearing on this issue, and the parties filed supplemental briefs.
Chapey had been incarcerated at the St. Louis Workhouse at the same time as Winfrey. At the time of the trial Chapey was serving a three year sentence, and was nearing the end of that time. Chapey testified at the evidentiary hearing before me that he was prepared to testify at Clemons' trial that Winfrey had told him that he (Winfrey) and Clemons were not involved in the rapes and murders, but instead had run to the end of the bridge when they realized what Richardson and Gray were about to do. He testified that Winfrey told him he saw two people being thrown off of the bridge, and that even though he was not guilty, he was going to testify for the state so he could get a "deal."
One of Clemons' trial attorneys, Jeanene Moenckmeier also testified at the hearing, and stated that Chapey had called her from prison and offered to testify. She tape recorded his statement and provided it to Moss as part of the pretrial discovery.
Chapey testified that when he was brought to trial to testify, Moenckmeier first came to the holding cell and prepared him for his testimony. After that, he says, Moss came to the holding cell and threatened him by telling him that if he testified in the case and the case was lost, if he (Chapey) ever got into trouble again, Moss would make sure that Chapey served every day of whatever sentence he got. As a result of this threat, Chapey says, he refused to testify and asserted his fifth amendment privilege.
Moenckmeier testified that when she visited Chapey in the holding cell to prepare him for his testimony, he told her he had been threatened either by Moss or by Moss's investigator, and that he was very frightened and would not testify. Moenckmeier could not recall whether she told the trial judge of this problem. There is no reference to it in the record, although there is a record of Chapey's asserting the 5th amendment and being therefore excused from testifying.
Moss testified that he knew Chapey was going to testify, but was not concerned because he did not think anyone would believe Chapey. Another jail house witness, Luis Vega, had also testified about jail-house statements made by Winfrey, and Moss was confident of his ability to effectively cross-examine both witnesses. Moss testified that the day Chapey was brought to court, a sheriff's deputy called Moss and said Chapey had asked to see him. Moss went to the holding cell and Chapey asked if he could help on his parole. Moss testified that he told Chapey that Chapey wasn't testifying for the state so he didn't understand why Chapey thought Moss would help him. Moss denied threatening or intimidating Chapey.
Several years later, in 1999 while this federal habeas case was pending and while Chapey was serving a new forty-year sentence, he met with an investigator from the Attorney General's office. He also wrote two letters to the Attorney General stating that after "intensive thinking" about the case he felt he could help the state if the state would help him. He said he had information that would "blow this case wide open," and stated that some of the information he had provided in earlier affidavits (filed in support of Clemons' post-conviction motion and in this federal habeas proceeding) was false.
*1125 I find from the evidence presented to me that Chapey is a very uncredible witness. Chapey impressed me as someone who only does what will help Chapey. I certainly do not believe him about what he claims Daniel Winfrey told him, and I find it unlikely that a jury would have believed him either. He has admitted that he was willing to change his testimony in whatever way would benefit him, and had he been called as a witness, there is no telling what he would have actually said.
Clemons argues that in the context of witness intimidation, a habeas petitioner need not show prejudice from the prosecutor's actions, but only need show that the prosecutor's tactics actually prevented the petitioner from presenting the witness's testimony to the jury. This argument has been accepted by the Fifth Circuit in United States v. Hammond, 598 F.2d 1008 (5th Cir.1979), but the Eighth Circuit specifically declined to follow Hammond in Peeler v. Wyrick, 734 F.2d 378 (8th Cir.1984), and held that harmless error analysis must apply. The theory behind this pre-AEDPA case has been followed by the Eighth Circuit in several more recent cases involving allegations of witness intimidation, and in each case the Court has required the defendant to show that the outcome of the trial would have been different had the witness testified. See United States v. Dogskin, 265 F.3d 682, 686 (8th Cir.2001)(citing Peeler in affirming denial of motion for new trial where investigator threatened witness with losing custody of child); United States v. Deering, 179 F.3d 592, 595 (8th Cir.1999)(denial of motion for new trial where no prejudice shown); Dodd v. Nix, 48 F.3d 1071, 1075 (8th Cir. 1995); Harrington v. Nix, 983 F.2d 872, 874-75 (8th Cir.1993).
Clemons has not shown prejudice from Chapey's failure to testify. Chapey is a particularly unbelievable witness. His own initial statement to Moenckmeier contained inconsistencies that would undoubtedly have been brought out on cross examination. Although I recognize that my credibility determinations are based partially on things that happened after Chapey would have testified at trial  his attempt to cut a deal with the Attorney General's office in 1999, the inconsistencies between his testimony and Moenckmeier's about the timing of their holding-cell interview, and whether he told Moenckmeier of the intimidation at the time or not  I believe that his testimony would not have affected the outcome of the trial. Therefore Clemons would not be entitled to habeas relief on this claim even if Moss in fact threatened Chapey to keep him from testifying. Moreover, I do not believe that Moss actually threatened the witness. The most believable scenario is that Chapey asked Moss if he would help him and Moss clearly communicated to Chapey, one way or another, that he was not in the business of helping witnesses who helped the defense. I am sure that Moss minimized the threatening nature of his demeanor and statements, just as I am sure that Chapey exaggerated them. But considering all of the evidence, I do not find that this rose to the level of prosecutorial misconduct sufficient to justify habeas relief.

2. Claim 11: Penalty Phase Closing Argument

Clemons argues that his due process rights were violated by Moss's improper closing arguments in the penalty phase of the case. In particular, Clemons objects to Moss's statements comparing his case to that of Charles Manson and John Wayne Gacy  comments for which the trial court later held Moss in contempt of court  and to Moss's statements dehumanizing Clemons, appealing to religious sentiments and fears, an improper hypothetical, mention of *1126 facts not in evidence, and improperly asserting personal opinion and knowledge.
The Missouri Supreme Court found that none of these arguments had been properly preserved except the one about the Manson/Gacy statement, and thus the state here argues that they are procedurally barred from habeas review. Clemons asserts, as he did before the Missouri Supreme Court, that any procedural default was caused by the ineffective assistance of his counsel. The Missouri Supreme Court did consider the arguments in the context of ineffective assistance of counsel, and did not find that counsel was ineffective for failing to object or seek a mistrial because of the other statements by Moss. 946 S.W.2d at 231. This is not an unreasonable application of the law, and so I will not consider the claim beyond that considered by the Missouri Supreme Court.
Before the trial began, the Court granted a defense motion directing the prosecutor not to use "any analogy involving Charles Manson, or raising any type of a horrible and well-known scenario and get the jurors thinking about it." Despite this ruling, in his closing argument during the death penalty phase of the trial, Moss stated:
that he has no significant history of prior criminal activity, you know, the same can be said of John Wayne Gacy, Charles Manson, the fellow that killed the seven 
Defense counsel objected, the trial court sustained the objection, directed the jury to disregard the statement, and denied Clemons' motion for a mistrial. After trial, the court held Moss in contempt of court and fined him $500 for violating the pretrial order, which Moss claimed he thought only applied to the guilt phase of the trial, not to the penalty phase.
The Missouri Supreme Court stated, "The critical component of due process analysis in cases involving prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." 946 S.W.2d at 217. It then went on to hold that there was no abuse of discretion in the trial court's denial of the mistrial, because the corrective measures taken (instructing the jury to disregard the statement) were sufficient to ameliorate any prejudice the statement may have created.
In the trial involving Marlin Gray, which preceded Clemons' trial, Moss had made similar statements and references to the Manson case, which is why the judge and defense counsel anticipated the issue. The Eighth Circuit rejected habeas relief to Gray, despite Moss's three references to the Charles Manson case. Gray v. Bowersox, 281 F.3d 749, 756-758 (8th Cir.2002). The first two statements there were made in the guilt-phase argument, and the Court of Appeals found that the trial court had properly sustained defense counsel's objection to the first comment and told the jury to disregard. The Court found no prejudice from the second comment, and characterized both of these comments as "obscure." Moss's third Manson comment in the Gray case came during the penalty-phase closing argument, and the Court of Appeals again found no ground for relief because the trial court sustained the objection and instructed the jury to disregard the comments. The Court found that nothing in Moss's comments in Gray approached the level of prejudice requiring a mistrial. In Gray the Court of Appeals distinguished the case of Newlon v. Armontrout, 885 F.2d 1328 (8th Cir.1989), where habeas was granted because the prosecutor "peppered" his argument with the names of Manson and other mass murders, and also distinguished Shurn v. Delo, 177 F.3d 662 (8th Cir.1999), and Antwine v. Delo, 54 F.3d 1357 (8th Cir.1995), where habeas was granted for similar arguments.
*1127 In Copeland v. Washington, 232 F.3d 969 (8th Cir.2000), the Court of Appeals granted habeas where the prosecutor referred to gang-related murders in other areas and stated that "there has never, ever been a more complete and utter disregard for the sanctity of human life as in this case." Although the decision there was stated in terms of whether defense counsel was ineffective for failing to object, the substantive analysis is the same as that here, and the court found that referring to other murders in Missouri's history, when considered in conjunction with other improper statements in the argument, was likely to have prejudiced the jury against Copeland. The Court reached a different conclusion with regard to one comment made during the guilt phase closing argument of the same trial.
The lesson from the Eighth Circuit cases appears to be that repeated references to mass murderers, when coupled with other improper arguments, may be sufficient to find the prejudice required to grant habeas, but that a single reference is not, especially where prompt objection is made and the trial court instructs the jury to disregard.
In this case I cannot say that the decision of the Missouri Supreme Court is contrary to or an unreasonable application of established law, because the statement was isolated, and it was immediately corrected. When taken in the context of the closing arguments as a whole, I cannot say that the prejudice from this statement deprived Clemons of a fair trial.

Grounds 7, 9, 12 and 15: Ineffective Assistance of Trial Counsel
Clemons has raised numerous claims of ineffective assistance of counsel. These claims include:
7. Petitioner was denied effective assistance of trial counsel in the investigation and preparation of his defense because:
(a) Counsel failed to conduct a proper investigation for the guilt phase, specifically
(i) counsel failed to prove that Cummins' identification of Clemons at a line up was impermissibly suggestive;
(ii) counsel failed to contact witnesses including Dr. Caldwell, Marie Hicks and Cedric Richardson, and failed to use the investigation from Internal Affairs which would have shown a pattern of police brutality in investigating the case;
(iii) counsel failed to investigate fact witnesses, including bystanders on the Illinois shore;
(iv) counsel failed to effectively impeach prosecution witnesses at trial.
(b) Counsel filed to retain expert witnesses, both for the guilt phase and for the penalty phase of trial, specifically experts on the subjects of:
(i) the distance from the bridge to the water and the likelihood that Cummins could have survived;
(ii) petitioner's background, psychology, and relationship with Marlin Gray and his propensity to follow, but not instigate, violence;
(iii) petitioner's non-violent nature and the mitigating circumstances of his background and educational difficulties.
(c) Counsel failed to prepare and file appropriate and adequate pretrial motions, in particular:
(i) motions to suppress the statements;
(ii) motion to suppress the line-up identification;
(iii) the Dr. Cross motion;
(iv) voir dire motions.

*1128 (d) Counsel failed to compel discovery from the prosecution, in particular an initial audiotaped interview and a used condom found on the bridge.
(e) Counsel failed to take depositions of Gene Cummins (Thomas Cummins' father) and Detective Pappas.
(f) Counsel failed to timely file a motion for expert witness funds under Ake v. Oklahoma.

9. Petitioner was denied effective assistance of trial counsel during the trial because counsel failed to
(a) challenge Michael Chapey's invocation of his fifth amendment right against self-incrimination;
(b) make a record of the prosecutor's intimidation of Chapey;
(c) develop and present evidence to support the motion to suppress Clemons' statements;
(d) properly impeach prosecution witnesses Cummins and the police officers regarding the inconsistency in their testimony;
(e) properly cross examine Cummins about the unreliability of his lineup identification of Clemons;
(f) properly cross-examine the police officers about the unreliability of Cummins' line-up identification or about the dropping of the charges against Cummins;
(g) place in evidence an important Cummins statement that Gray was the individual standing above him at the time the victims were pushed into the water;
(h) impeach Daniel Winfrey with an inconsistent statement; and
(i) opening the door to the statements of Antonio Richardson.
12. Petitioner was denied effective assistance of counsel during the penalty phase because counsel failed to
(a) present psychological, psychiatric, and educational experts attesting to petitioner's nonviolent character;
(b) present character witnesses; and
(c) failed to rebut evidence of petitioner's violent conduct in prison.
15. Counsel failed to properly preserve or exhaust proper constitutional claims.
The state argues that most of these claims are procedurally barred, and as set forth above, I agree that many were not raised properly below and are barred. The post-conviction motion hearing conducted by the state court was very extensive in this case, spanning several days, and Clemons' counsel presented extensive evidence in addition to the testimony of trial counsel Constantinou and Moenckmeier. The state judge rejected the claims of ineffective assistance of counsel, and that determination was affirmed by the Missouri Supreme Court.
Much of Clemons' argument about his trial counsel focuses on their personal relationship with one another, and on attorney Constantinou's subsequent disbarment. Clemons also argues that to the extent the post-conviction motion court rejected his claims of ineffectiveness, it did so because Constantinou's testimony was less forceful than it should have been because Moss intimidated him. I previously declined to hold an evidentiary hearing on this issue of prosecutorial intimidation of defense counsel, as I found it was non-cognizable in habeas. I now note, however, that my review of the record in this case and my reading of both the post-conviction motion court's decision and that of the Missouri Supreme Court shows that Constantinou's *1129 testimony about his preparation and strategy, while of course important, was not truly determinative of most of the issues being presented to me here. Certainly the state courts relied on his testimony that many things were strategic decisions, but the vast majority of both opinions focuses on the legal standards applicable to the specific claims of ineffectiveness and the prejudice (or lack thereof), rather than on what Constantinou stated about why he took certain actions. Even Moenckmeier's affidavit does not contest Constantinou's testimony (and her own) at the post conviction hearing that many of the decisions made were strategic ones. In general, the allegations about Constantinou's relationship with his co-counsel Moenckmeier and about his alleged intimidation by Moss simply have no effect on the claims at all.
To state a claim for ineffective assistance of counsel, petitioner must establish that his counsel's performance was deficient and that the deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 700, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To decide whether counsel's performance was constitutionally deficient, the inquiry must be whether, in light of all the circumstances, the identified acts or omissions fell outside the range of professionally competent assistance. Id. at 690, 104 S.Ct. 2052. In determining whether counsel's conduct was objectively reasonable, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689, 104 S.Ct. 2052. To establish the requisite degree of prejudice, petitioner must demonstrate that the decision reached would likely have been different absent counsel's error. Id. at 694, 104 S.Ct. 2052; Griffin v. Delo, 33 F.3d 895, 900 (8th Cir.1994). With these standards in mind, I now turn to the specific claims of ineffective assistance.

1. 7(a): Failure to investigate, call and impeach witnesses

As stated above, subclaims (i), (iii) and (iv) are procedurally barred, because they were not raised in the consolidated appeal.
Clemons did raise the issue of his counsel's failure to contact witnesses Caldwell, Hicks and Richardson, who, he says, had information relevant to the motion to suppress. (Subclaim 7(a)(ii)). The Missouri Supreme Court discussed these witnesses in detail, as well as their expected testimony, and concluded, as did the postconviction motion court, that their testimony would not have changed the outcome of the suppression hearing, and that therefore counsel was not ineffective for failing to call them to testify. 946 S.W.2d at 220-221. Having reviewed the records in full, I cannot say that this was an unreasonable application of Strickland. In fact, I agree with the conclusions of the Missouri Supreme Court, and find that Clemons has not shown prejudice from the failure to interview or call these witnesses at trial.

2. 7(b): Failure to retain expert witnesses

In these grounds Clemons argues that his counsel was ineffective for (i) failing to obtain an expert to testify about the distance Cummins fell from the bridge and the likelihood of his surviving, (ii) failing to obtain expert testimony that Clemons' "background, psychology and relationship with Gray" would predispose him to follow violent behavior but not instigate it or perform it after cool deliberation, and (iii) failed to put on mitigating evidence regarding Clemons' non-violent nature.
Petitioner did not present the first of these grounds to the Missouri Courts, and so it is procedurally barred.
Respondent argues that Clemons presented the second ground only as it related *1130 to the penalty phase of the trial, and so it is also procedurally barred. I believe the Missouri Supreme Court's opinion can be construed as including this claim, and so I will consider it on the merits in my discussion of Ground 12 below. The third part of this claim is also discussed there, as it is the same as the claim raised in ground 12(a).

3. 7(c): Failure to adequately litigate pretrial motions

Clemons claims his trial counsel were ineffective in their litigation of his pretrial motions, which ineffectiveness caused them to lose the motions. Specifically, he argues that they failed to cite the proper law, failed to provide "adequate description of fact," and filed untimely motions. Clemons asserts that this ineffectiveness resulted in his losing his motion to suppress the confession, his motion to suppress the line-up identification of him by Cummins, a "Dr. Cross" motion, and motions relating to voir dire.
The only one of these arguments that Clemons raised before the Missouri courts was the argument that counsel were ineffective in failing to obtain suppression of the confession. (This is essentially the same claim as subclaim 7(a)(ii), discussed above). The state court determined that counsel were not ineffective and that in fact the motion to suppress was properly denied. 946 S.W.2d at 220-221. The Missouri court's determination was not an unreasonable application of Strickland. In fact, I agree with it, and do not believe counsel was ineffective or that Clemons was prejudiced in any way. The confession was properly admitted, and counsel was not ineffective for failing to prevail on a suppression motion that should have been denied, and was.

4. 7(d) and (e): Failing to obtain discovery

Clemons asserts that trial counsel was ineffective for failing to obtain discovery of the first audiotaped confession and to obtain discovery of a condom that was found on the bridge. He also claims ineffectiveness for failing to take depositions. As discussed above, petitioner did not raise any of these issues on appeal, and therefore they are procedurally barred.

5. 7(f): Failure to timely seek funds for expert witnesses

Petitioner's trial counsel did not seek court funds for an expert witness until the day before trial, and the trial court denied the motion as untimely. I will discuss this claim in conjunction with my discussion of claim 12(a) below, because the Missouri Supreme Court treated them together.

6. Claim 9

In his ninth ground for relief Clemons raises several claims that he was denied effective assistance of trial counsel during the trial.
Only subclaims (b) and (c), which relate to the prosecutor's alleged intimidation of Michael Chapey and the failure to adequately develop evidence supporting the motion to suppress Clemons' statements were properly raised in the state courts. The others are all procedurally barred.
I have discussed the underlying claims and rejected them on the merits in my discussion of grounds 2, 3, 6A, 7(a)(ii) and 7(c)(i). The Missouri Supreme Court also discussed the claims of ineffective assistance of counsel relating to these claims, and rejected those claims as well.
With regard to the motion to suppress (Claim 9(c)), the Missouri Supreme Court explicitly considered the arguments that counsel was ineffective for failing to argue *1131 that the statements were made in violation of the Miranda warnings, and found that counsel could not be held to be ineffective for "failing to argue a legally-insufficient point more vociferously." 946 S.W.2d at 220. It also discussed the post-conviction testimony provided by potential witnesses Dr. Caldwell, Cedric Richardson and Marie Hicks and concluded that even had their testimony been presented at trial it would not have made a difference to the denial of the motion to suppress, because, as to Hicks and Dr. Caldwell, it was cumulative of other evidence already presented at the hearing, and as to Richardson, it was not credible. 946 S.W.2d at 220-221.
I have reviewed these determinations by the state court under the standards required, and I cannot say that any of them are unreasonable determinations of the facts or unreasonable applications of the Strickland standard. Clemons has simply shown no prejudice from counsel's conduct. Therefore these claims do not provide a basis for habeas relief.
With regard to the Chapey claim (Ground 9(b)), the specific claim of ineffectiveness here is that trial counsel failed to make a record during the trial of Moss's intimidation of Chapey. Even after conducting an evidentiary hearing, I am not at all sure that Moenckmeier knew of the alleged intimidation at the time of trial. Chapey equivocated about whether he had told her. Moenckmeier said that she was sure she knew but thought maybe she did tell the trial judge, although there is nothing on the record to reflect that. My impression at the evidentiary hearing is that neither Chapey nor Moenckmeier could remember whether they discussed the alleged intimidation at the time Chapey was refusing to testify, and that each was trying to say, at the evidentiary hearing, whatever might help Clemons' case now. Neither Moenckmeier nor Constantinou clearly stated that they knew about it when they testified at the post-conviction motion hearing. In fact, Constantinou testified that he had suspected that Chapey might assert his privilege against self-incrimination even before calling him. He also testified that he did not press the issue at trial because he was concerned that Chapey would not have been a very credible witness in any event.
Given that I have found that Chapey was not intimidated by Moss at the trial, and that Moss did not engage in prosecutorial abuse at that time, Clemons cannot have been prejudiced by his counsel's failure to develop the record during trial, because nothing they could have done at that time would have made any difference to the outcome of the case. Thus, this claim cannot form the basis for a claim of ineffective assistance of counsel.

7. Claim 12(a), 7(b)(ii) and (iii), and 7(f)

In his subpart (a) of his twelfth claim for relief, Clemons claims that his counsel was ineffective during the penalty phase for failing to present psychological, psychiatric, and educational experts attesting to petitioner's nonviolent character. This claim is essentially the same as that presented in ground 7(b)(ii) and (iii) and is related to that raised as ground 7(f), where Clemons asserts that counsel was ineffective for failing to timely file a motion for expert witness funds under Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). Clemons presented these issues on consolidated appeal both as a claim of trial error and as a claim of ineffective assistance of counsel. Because the Missouri Supreme Court's opinion on this issue deals with several aspects of these claims in great detail, I set it out here:
Appellant claims error on the part of the trial court in denying his request for *1132 funds to provide for expert testimony on his mental state. He maintains that his mental condition was crucially relevant to his criminal culpability and the punishment he faced. He cites Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), for the proposition that due process requires that he be allowed access to expert witnesses.
Ake says:
"A defendant's mental condition is not necessarily at issue in every criminal proceeding ... and it is unlikely that psychiatric assistance ... would be of probable value in cases where it is not. The risk of error from denial of such assistance, as well as its probable value, is most predictably at its height when the defendant's mental condition is seriously in question.... [W]hen a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum assure access to a competent psychiatrist....."
(Emphasis added.) 470 U.S. at 82-83, 105 S.Ct. at 1096.
Appellant claims he met the Ake "seriously-in-question" standard by filing a notice of intent to raise diminished capacity and a notice of mitigating circumstances. However, these bare notices, without more, are insufficient to show the trial court that appellant's mental condition would, in fact, be a significant factor at trial.
Any defendant can make a bald statement of diminished capacity or claim that he acted under extreme mental duress. The State is not required to provide expert psychiatric assistance based on unsupported allegations, however. To qualify under Ake, a defendant must allege facts, not state mere legal conclusions or theories, to show the trial court that his or her mental condition is relevant to the issues before the trial court. Appellant states that his pretrial motion seeking funds and the suggestions in support thereof demonstrate the relevancy of his mental condition. Appellant's motion states:
Missouri law makes Reginald Clemons's mental condition relevant to criminal responsibility and sentencing in many significant ways: (a) competency at trial and sentencing; (b) specific intent to commit first degree murder; (c) legal insanity or diminished capacity; (d) competencies to waive his rights, including the right not to incriminate himself and to waive counsel; (e) mental health issues as they relate to mitigation of sentence.
This survey of the ways in which a mental condition may be relevant in some criminal cases does not demonstrate any reason for the trial court to find that appellant's actual mental condition was, in fact, seriously at issue in this case. Appellant's motion does not assert a fact-based claim that he was legally insane at the time of the crime, or that he was incompetent to stand trial, or that he was incapable of forming the specific intent to commit the crime.
The only "facts" appellant alleges in his motion and attached affidavits regarding his mental condition are that he suffers from learning disabilities and attention deficit hyperactivity disorder (ADHD) and speculation that he "might" have a neurological defect. The mere allegation of any abnormal mental condition is not enough to cross the Ake threshold; not every mental abnormality is relevant to a defendant's mental state for the purposes of criminal culpability. In addition, mere speculation as to a mental defect, without alleging any basis to support the speculation, is insufficient to raise the issue under Ake. Appellant's allegations and speculations do not rise to the level of significance necessary to *1133 cross the Ake threshold; they do not put the defendant's mental state "seriously in question" or render it likely to be a "significant factor" at trial.
Appellant also filed a motion requesting an order to allow a particular psychologist to examine him regarding diminished capacity and death penalty issues. He claims he needed such an investigation because there would be an issue at trial "as to who was the leader and who were the followers, whether defendant understood the Miranda warnings, (and) whether defendant understood the consequences of his actions including the criminality of his acts." The motion fails, likewise, to allege any facts to suggest that these questions were seriously in issue or from which the court might infer a genuine possibility that appellant did not or could not understand the criminality of his acts. We repeat: A mere allegation that a defendant's mental capacity is at issue does not make it so. Facts supporting the allegation are necessary to show the seriousness of the allegation and its relevancy to the issues before the trial court.
. . . . .
Such a factual basis is wholly absent in this case. Claims of learning disabilities and ADHD are not mental conditions that, of themselves, are so consequential as to become a significant factor where the issue is appellant's mental condition as it relates to his criminal culpability. We conclude that appellant did not put his mental state seriously at issue or provide any factual support for a claim that it might reasonably become a significant factor at trial. The trial court did not abuse its discretion in failing to grant appellant's motion requesting funds for mental experts.
. . . . .
In a related claim, appellant finds his counsel ineffective in the penalty phase for failing to call mental health experts to testify. Appellant contends that counsel's decision not to call these witnesses was not an informed, strategic decision because counsel failed adequately to investigate possible mitigating circumstances to present at penalty phase.
Counsel's presentation of penalty phase evidence is a matter of professional judgment. Antwine v. State, 791 S.W.2d 403, 407 (Mo. banc 1990). No duty exists in counsel to present mitigating character evidence at penalty phase. Clemmons v. State, 785 S.W.2d 524, 528 (Mo. banc 1990). Defense counsel is under no obligation to present the defendant's background in mitigation in a death penalty case. Schneider v. State, 787 S.W.2d 718, 721 (Mo. banc 1990). Defense counsel hired Maryann Marxhors to investigate appellant's background to determine whether psychiatric evidence would avail defendant in either the guilt or penalty phase. Armed with appellant's school and medical records, counsel consulted with a psychiatrist in California to see whether he might help defendant's case. This psychiatrist indicated that he would be "crucified" on cross-examination, due to material in the records which suggested that appellant was aggressive. On the basis of this investigation, counsel chose not to put on any psychiatric evidence.
Appellant insists that counsels' decision was not strategic because it was not well-informed. The record shows otherwise. Counsel did attempt to investigate as to whether any substantive claims existed relating to a mental defect or diminished capacity in appellant. Counsel ultimately determined that the adverse inferences from such evidence, as well as potential rebuttal evidence brought out in cross-examination by the prosecution, outweighed the potential *1134 good such evidence might have produced. This was an informed, strategic choice that is not subject to the judgment of hindsight. Cheek v. State, 459 S.W.2d 278, 281 (Mo.1970).
Moreover, as we observed above, we have reviewed the testimony of appellant's experts at the Rule 29.15 hearing and found that the testimony was not such that it made it probable that the outcome of the penalty phase would have been different. Appellant's point is denied.
946 S.W.2d at 221-225.
Based on the evidence and arguments in the record, it is clear that the Missouri Supreme Court appropriately considered the Ake and Strickland standards and that its application of these standards was not unreasonable. A review of the post-conviction motion record shows that the Missouri court's determination of the facts was also reasonable.

8. Claims 12(b) and (c)

The other parts of Clemons' twelfth claim allege that counsel was ineffective during the penalty phase for failing to present "witnesses who would have testified to Petitioner's good and non-violent character" (subclaim (b)), and for failing to rebut evidence of petitioner's violent conduct in prison (subclaim (c)).
The respondent contends that subclaim (b) is the same as other claims already rejected, but I believe that this is different and refers to counsels' failure to call the character witnesses who testified at the post-conviction motion hearing. These included Clemons' brother and several neighbors and friends who testified that had they been called they would have testified to petitioner's violent upbringing, difficult childhood, and lack of sexual aggressiveness.
Subclaim (c) alleges that counsel were ineffective for failing to call Robert Asbridge to rebut the state's evidence that Clemons had been the subject of prison disciplinary action because of a fight with Asbridge.
Clemons' appellate brief presented these claims in a combined form, under the argument that counsel was ineffective during the penalty phase. The brief named Asbridge and highlighted the jail discipline issue. But it did not name the brother or other witnesses mentioned in the habeas petition, and instead only argued generally that there were witnesses who would have supported the experts' views of Clemons' non-violent personality. The Missouri Supreme Court rejected these claims, noting that:
In his brief, however, appellant only identifies one of these lay witnesses, Robbie Asbridge.
946 S.W.2d at 226. The Court then only considered the arguments about Asbridge. It affirmed the post-conviction court's holding that counsel was not ineffective for failing to call Asbridge because his testimony was not credible and because even if his testimony had been believed it would not have made a difference in the outcome. This was especially so because Asbridge could have rebutted only one of the two different incidents of Clemons' jail violence that the state presented.
It appears to me that the claim petitioner now designates as 12(b) is procedurally barred, because it was not considered on the merits by the Missouri Supreme Court because it was not properly raised. It was considered, however, by the post-conviction court, and was rejected. To the extent it is not procedurally barred, I find that the state court's determination that counsel was not ineffective for failing to call these lay witnesses in the penalty phase of the case is not an unreasonable determination of the facts or an unreasonable application of Strickland. The postconviction *1135 court noted that the defense had called eighteen witnesses at the penalty phase of movant's trial, "including family members, relatives, friends, two ministers and a school teacher." The court found that the testimony of these other witnesses would be cumulative, and I agree. It was therefore not ineffective for counsel not to call these additional witnesses. Additionally, the Missouri court's resolution of the Asbridge claim is similarly reasonable both factually and legally.

9. 15: Failure to Preserve Claims

Ground 15 is a catch-all claim that any failure to preserve claims or exhaust remedies was caused by ineffective assistance of counsel. This claim presents no grounds for habeas relief, and none will be granted.

Grounds 10 and 13: Improper Jury Instructions
In his traverse, Clemons withdrew grounds 10 and 13 of his petition. These claims are therefore moot.

Ground 14: Errors in Post-Conviction Hearing
In Ground 14 Clemons alleges that the post-conviction relief court improperly excluded evidence of witness intimidation based upon the conclusion that claims of prosecutorial misconduct were not a proper subject for post-conviction relief. When Clemons requested to call witness Michael Chapey as a witness at the post-conviction hearing, the judge refused to allow him to be called, stating that claims of prosecutorial misconduct were not a proper subject for a post-conviction hearing. Clemons claims that this violated his rights under the due process clause, both because it denied him a full hearing on a constitutional claim, and also because once a state creates a right to a post-conviction proceeding, there arises a due process right to have that hearing be fair. Respondent argues that this claim is not cognizable in federal habeas proceedings, and I agree.
"Because there is no federal constitutional requirement that states provide a means of post-conviction review of state convictions, an infirmity in a state post-conviction proceeding does not raise a constitutional issue cognizable in a federal habeas petition." Williams-Bey v. Trickey, 894 F.2d 314, 317 (8th Cir.1990)(citing Williams v. Missouri, 640 F.2d 140, 143 (8th Cir.1981)); see also Gee v. Groose, 110 F.3d 1346, 1351-52 (8th Cir.1997).
Here Clemons has provided nothing that would take this claim outside the rule that there is no federal habeas remedy for improprieties in state post-conviction proceedings. Moreover, as discussed above, I have now held a full hearing on the Chapey allegations and have found that there was no prosecutorial misconduct that would entitle Clemons to relief. Clemons' fourteenth ground for habeas relief is denied.

V. Conclusion and Certificate of Appealability

I find that Clemons is entitled to a writ of habeas corpus vacating his death penalty on the ground presented in his claim 4B: that jurors were improperly excluded in the death-qualification process in violation of Clemons' Sixth Amendment and Fourteenth Amendment rights. I find that all other claims for habeas relief are either procedurally barred or fail on the merits, and must be denied.
Under 28 U.S.C. § 2253, an appeal may not be taken to the court of appeals from the final order in a § 2254 proceeding unless a circuit justice or judge issues a Certificate of Appealability. 28 U.S.C. § 2253(c)(1)(B). To grant such a certificate, the justice or judge must find a substantial showing of the denial of a federal constitutional right. Id. at § 2253(c)(2); *1136 see Tiedeman v. Benson, 122 F.3d 518, 522 (8th Cir.1997). A substantial showing is a showing that issues are debatable among reasonable jurists, a court could resolve the issues differently, or the issues deserve further proceedings. Cox v. Norris, 133 F.3d 565, 569 (8th Cir.1997) (citing Flieger v. Delo, 16 F.3d 878, 882-83 (8th Cir. 1994)).
I find that Clemons is entitled to a Certificate of Appealability on his claims of prosecutorial misconduct as set forth in claims 6, 8 and 11, and on his claim that venireperson Doss was improperly removed from the venire panel, as set forth in Claim 4A. I do not find that reasonable jurists could differ on his remaining claims, so I will deny a Certificate of Appealability on those.
Accordingly,
IT IS HEREBY ORDERED that the petition for writ of habeas corpus filed by Reginald Clemons is granted only as to the death penalty, and is otherwise denied. Clemons' death penalty is vacated, and he must either be sentenced to life in prison without the possibility of parole or must be given a new trial on the state's request for the death penalty.
IT IS FURTHER ORDERED that all other pending motions, including Clemons' recently filed pro se motion to supplement, are denied.
IT IS FURTHER ORDERED that Clemons is entitled to a Certificate of Appealability on the claims listed here as numbers 4A, 6, 8, and 11. He is not entitled to a Certificate of Appealability on his remaining claims.